**William GOLDEN, Plaintiff,**

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant.**

**CIV-89-751C.**

United States District Court,
W.D. New York.

July 5, 1990.

ry Judgment at 2.

**956**

Sharon Anscombe Osgood, Buffalo, N.Y., for plaintiff.

Dennis C. Vacco, U.S. Atty. (Donald P. Simet, Asst. U.S. Atty., of counsel), Buffalo, N.Y., for defendant.

CURTIN, District Judge.

## I. BACKGROUND

Plaintiff William Golden brought this action under the Social Security Act, 42 U.S.C. Sec. 405(g) ("Act"), challenging the final determination of the Secretary of Health and Human Services that he was disabled under the Act as of November, 1985. The plaintiff last met the insured status requirements of the Act on March 31, 1982. Currently pending before the court are the Secretary's motion for judgment on the pleadings and the plaintiff's motion for summary judgment.

Plaintiff claims that he became disabled as of November, 1980, due to the combination of back problems and severe Post Traumatic Stress Disorder ("PTSD") resulting from his service in Vietnam. He filed two previous applications for disability and supplemental security income ("SSI") benefits on December 3, 1982, and February 16, 1984. Both applications were rejected without appeal to this court. The current application was filed on April 23, 1987. Its initial rejection was reviewed at a hearing held on September 19, 1988. The Administrative Law Judge ("ALJ") reopened the application of February 16, 1984, and found that plaintiff was under a disability commencing in November, 1985, due to the combination of exertional limits related to his back problems and nonexertional limits related to his PTSD. Accordingly, the ALJ declared plaintiff eligible for SSI benefits as of April 23, 1987, the date of his last application. He also found plaintiff ineligible for disability benefits because his disability began after March 31, 1982, the date of his last insured status (T. at 21–32).

## II. FACTS

Plaintiff is a 46–year–old Vietnam veteran suffering from severe Post Traumatic Stress Disorder. His treating psychiatrist, Dr. Herman Szymanski, has been treating

the plaintiff since approximately November, 1985. In a report dated May 12, 1987, he diagnosed the plaintiff's condition as severe PTSD (T. at 329).

> Mr. Golden has intrusive recollections of combat whenever he is faced with a stressful situation.... [F]or a few seconds at a time (but repeatedly during the same episode of stress) he does think he is in Viet Nam.... He has nightmares of Viet Nam twice a week.... He feels he doesn't belong here, he should be back with his unit, which was wiped out a few weeks after he left Viet Nam.... Without medication he sleeps 2–3 hours.... His prognosis is for no or little improvement. He is not employable.

In a Social Security Administration medical report dated June 20, 1988, Dr. Szymanski stated that plaintiff suffered from PTSD since leaving Vietnam. His symptoms included hypervigilance, social withdrawal, irritability, and an inability to carry out goal-directed activities (T. at 318). He "has no friends, no activities except gardening." (T. at 322.) "He is subject to intense depression, lack of energy, inability to sleep. Social situations cause irritability, so he avoids them." (T. at 323.)

Dr. Szymanski reviewed the plaintiff's medical history and treated him over a sustained period of time. In a letter dated September 12, 1988, he gave his opinion that the plaintiff had been totally disabled since November, 1980, due to his PTSD (T. at 324). He wrote in a progress report dated August 12, 1988, that plaintiff's experiences in Vietnam were

> almost the maximally stressfull [sic] imaginable.... Mr. Golden is a classic case of severe PTSD with severe job impairment. He is irritable, he is continually driven by memories of Viet Nam; it is difficult at times to keep this severely ill individual from killing himself in some indirect way (e.g. last year, by making a bomb in his home, resulting in severe burns to his fingers). My treatment goal at this point with Mr. Golden is to keep him alive, keep him from hurting someone, and keep him growing his house plants. At this point, and for the entire future (unless a miracle drug is invented), that's all that can be accomplished. T. at 325, 328.

Dr. Szymanski's opinion is supported by Barbara Wolfrum, a social worker who has known the plaintiff since 1981. She was his case coordinator when he was an impatient in 1981 at the Veterans Administration Alcohol Rehabilitation Unit. She was his social worker on psychiatric units in 1986 and 1987, and has spoken with him occasionally between 1981 and 1986. She states that he has exhibited severe symptoms of PTSD since 1981. In 1981 he was "hyperalert, sensitive, suspicious of authority and he only felt comfortable in the Viet Nam Veterans' Psychotherapy Group...." (T. at 345.) In her judgment, he could not have held a job at that time due to his difficulty relating to people, general emotional distress, physical discomfort, and the requirement of outpatient treatment (T. at 345, 346). Ms. Wolfrum stated that the indication in the file during plaintiff's hospitalization in 1981 (T. at 347, 424) that plaintiff was employable could not be corrected because plaintiff was not medically stabilized and did not complete the program (T. at 345, 346).

Sharon McGrath, R.N., director of C.O.P. I.N. House, a halfway home for veterans, reported that she has known the plaintiff since 1983. He was a resident at C.O.P. I.N. House for three months in 1985 and 1986 (T. at 315). Ms. McGrath states that the plaintiff has experienced "numerous periods of decompensation and suicidal ideation and major depression." (T. at 312.) In a report dated May 5, 1987, she states that since she has known him, the plaintiff has not been able to function in a work setting due to fits of anger and inability to complete tasks (T. at 243).

Plaintiff has not worked since November of 1980. Before that he worked for approximately five years as an electrician, moving from job to job before quitting due to back pain. Previously, he has worked as a counselor, laborer, and mechanic in Buffalo and Johnstown, Pennsylvania (T. at 75–81).

Upon his initial return from Vietnam, plaintiff began a course of study in sociology and psychology at Buffalo State College. He continued in school for about three years without finishing a degree (T. at 72–73). While in school, he worked as a counselor at Erie Community College. That job ended when he and his wife were shot by his supervisor (T. at 73). In the period prior to the shooting, he had become "more and more aware of his violent tendencies and begun to stockpile weapons at home and was armed most of the time." (Narrative report prepared by a Veterans Administration social worker during plaintiff's psychiatric hospitalization in 1985, T. at 220.) After the shooting, his troubles increased. His wife and son left him, and he began to have troubles with the police. He had difficulty sleeping and eating and felt threatened by everyone (T. at 220). Plaintiff testified that he has been arrested over twelve times since 1968 and that he served a three-day jail sentence for menacing in 1987 (T. at 81, 94).

The medical record is extensive. Plaintiff was treated at the Veterans Administration Hospital ("VAMC") at Buffalo in October and November of 1972. He was observed for passive-aggressive personality. He was described as tense, anxious, and angry but was given no medication for his psychiatric complaints. The staff felt that he was no danger to himself or others and referred him to Monsignor Carr Institute for follow-up psychological treatment. (Monsignor Carr Institute records have been lost.) The plaintiff's prognosis was guarded, but he was considered employable (T. at 194).

A termination summary from Buffalo General Hospital Community Mental Health Center indicates that plaintiff was seen on July 13, 1974, with complaints of head pain. He was diagnosed as having an adjustment reaction to adult life, but he never returned for treatment. His prognosis was guarded.

Plaintiff was admitted to VAMC from August 21, 1975, to September 5, 1975. He was observed for hostility, "vagueness," and passive aggressive personality. He stated that he was "afraid that he would lose control and hurt someone or himself." His symptoms seemed unchanged since his 1972 admission. Again, he was given no medication but was released for care by a private psychiatrist. His prognosis for future adjustment was poor. The staff found him employable at that time (T. at 348, 422).

Plaintiff was seen in the VAMC hypertension clinic in 1978 and accepted into the program. However, he did not continue treatment. He was seen at the clinic on several occasions between 1978 and 1980 but frequently missed appointments and failed to return. He was examined at the Hypertension clinic on April 28, 1980. Dr. Herman, the director of the clinic, noted a past history of personality disorder but reported him as "asymptomatic at the present time." (T. at 237–238.)

Plaintiff was admitted to VAMC again from May 7, 1981, to May 28, 1981, for alcohol rehabilitation and passive-aggressive personality. His records indicated possible character disorder, so he was seen by a psychiatrist, who diagnosed depressive paranoid trends with antisocial personality traits. He was hostile and suspicious of the staff, and he expressed much anger about his experiences in Vietnam. He was discharged for resisting care after having a number of problems with the staff. Plaintiff was assessed as competent and employable at the time of his discharge. However, the record was later corrected to indicate that employability was not determined at that time (T. at 345–347, 424).

Plaintiff was readmitted to VAMC from June 24, 1981, to July 2, 1981. He was diagnosed as having a herniated disc and offered surgery. He declined at that time and was discharged by a neurologist on July 2, 1981, as employable (T. at 426–427). He returned to VAMC on July 6, 1981, and underwent a laminectomy on July 24. He was discharged on July 31 with no determination of employability at that time (T. at 349).

At a follow-up examination on September 8, 1981, plaintiff complained of shooting pain in his right leg. The doctor noted

possible right sciatic nerve injury and prescribed physical therapy (T. at 350–351, 409). A physical therapy report dated September 15, 1981, reported that plaintiff complained of pain radiating down his left lower extremity and numbness in the right lower extremity. The pain in the right side of the lumbosacral region and right lower extremity was gone (T. at 411). Plaintiff was terminated from therapy on November 15, 1981, after failing to appear for approximately one and one-half months (T. at 412).

The medical records were not produced, but the findings of the ALJ on plaintiff's first application for disability indicate that the plaintiff was examined by Dr. Gerald Kraft on December 14, 1981. Dr. Kraft found electrical evidence of right L5 radiculopathy (T. at 334, 338).

Plaintiff was next admitted to VAMC from February 4, 1982, to March 16, 1982, with complaints of low back pain and spasms of the right calf, sole of the right foot, and left thigh. Plaintiff was given physical therapy and pain medication and placed in the TENS program (T. at 231–232). Plaintiff was placed in the Vocational Rehabilitation Training program, but was discharged before a complete evaluation could be conducted. There was no diagnosis made before discharge, but he was discharged as "not employable" and sent home with pain medication and a TENS unit (T. at 232).

VAMC clinical notes dated March 25, 1982, stated that plaintiff was referred to a community agency to pursue vocational rehabilitation (T. at 419). Another clinical note dated April 8, 1982, indicated that plaintiff completed 17 TENS treatments and achieved 75 per cent pain relief lasting for 20 to 35 minutes after each treatment (T. at 230).

Plaintiff was seen by Dr. Garben at VAMC on May 27, 1982. The plaintiff reported continued lower back pain even though he was getting significant relief from the TENS unit. Dr. Garben found chronic low back pain, degenerative joint disease of lumbosacral spine status post L5–S1 disc surgery, and a possible right sciatic nerve injury (T. at 234). In another note, Dr. Garben reported that the plaintiff had no address or telephone but was working through the Bureau of Vocational Rehabilitation to obtain a job. He was also attempting to obtain funds to finish his education (T. at 228).

Again the records were not produced, but the ALJ's findings of October 31, 1983, indicate two more examinations in this period. On November 11, 1982, an examination at Deaconess Hospital indicated "disc space narrowing at L5–S1 with associated osteophyte formation indicating disc degeneration or herniation at this level." There was "associated articular facet osteoarthritis bilaterally at L5–S1." (T. at 334, 338.)

On March 3, 1983, there was a consultative disability examination by Dr. Naim Dawli. The ALJ described the doctor's impression as acute back pain with possible recurrent herniated disc with nerve root involvement, especially on the right side (T. at 339).

The next examination in the record is dated May 31, 1983. The New York State Education Department's Office of Vocational Rehabilitation requested an evaluation of his back impairment. Dr. Donald Ehrenreich diagnosed lumbar radiculopathy and recommended a return to VAMC for evaluation. He recommended that the plaintiff avoid physical exertion involving the back and legs. Prognosis was poor (T. at 352–353).

Plaintiff was examined by Dr. William Georgi on June 8, 1983. Plaintiff reported continued pain in the right back and right leg since his 1981 surgery. In addition, he reported neck pain and numbness and pain running down from his neck to a right finger. Dr. Georgi found some abnormalities in the right ulnar nerve which suggested entrapment at the elbow level (T. at 227).

The next indication in the record is a hospitalization at VAMC from August 19, 1985, to November 1, 1985, relating to his PTSD. Plaintiff complained of continued lower back pain, intense anxiety, and feelings of wanting to harm himself. He was diagnosed as having PTSD and given individual and group psychotherapy. After an

incident with another patient, he was discharged to C.O.P.I.N. House as "competent and employable" with an instruction for continued psychotherapy (T. at 215–216).

Plaintiff was next admitted to VAMC from March 13, 1986, to April 4, 1986. He complained of depression, continuing back pain, and pain radiating down his legs. A neurology exam found no abnormalities. An orthopedic consultation found L5–S1 sequential instability and knee problems. Dr. Szymanski, plaintiff's treating psychiatrist, diagnosed PTSD, alcohol abuse, and severe psychosocial stressors due to financial problems. He found that his highest level of adaptive functioning in the past year was "fair" (T. at 196–199).

Dr. Eugene Cisek performed a consultative examination on July 22, 1987. His diagnosis was degenerative disc disease, lumbosacral level with intermittent recurring radiculopathy (T. at 251–253). His report gives a detailed evaluation of the plaintiff's physical complaints at that time and his motor functioning.

Plaintiff was admitted to the acute inpatient psychiatric ward at VAMC from March 3, 1987, to April 16, 1987. He stated that he had been constructing a bomb to blow up the federal building due to denial of his VA disability benefits. After burning his hand, he decided to seek help. The diagnosis was PTSD and episodic alcohol abuse. A physical examination revealed chronic low backache secondary to degenerative joint disease of the L5 and S1 area. Recommendations were conservative, hot packs and pelvic traction. Neurological examination indicated possible bilateral S1 disease as well. Plaintiff was discharged to C.O.P.I.N. House as unemployable, competent, and without malignancy (T. at 275–276).

### III. ALJ FINDINGS

The ALJ refused to give treating-physician weight to the evidence given by Dr. Szymanski, plaintiff's treating psychiatrist, for the period prior to the beginning of the physician-patient relationship. The ALJ argued that Dr. Szymanski's opinion concerning the pre-treatment period would be spec-

ulative (T. at 23). The ALJ also refused to give treating-physician weight to the evidence given by Barbara Wolfrum, the social worker, or Sharon McGrath, a nurse and director of C.O.P.I.N. House (T. at 24).

The ALJ found the plaintiff's testimony credible as to his PTSD (T. at 27). He recognized the existence of plaintiff's PTSD and his back and knee problems. However, he found that plaintiff's condition following his 1981 back surgery improved "to the point where he could have performed work of a light level of exertion." He also found that plaintiff's PTSD increased in severity over time, but probably did not become disabling until November, 1985, the time when Dr. Szymanski began treatment of the plaintiff (T. at 26–29). He argued that the plaintiff's PTSD could not have been disabling since his return from Vietnam because the plaintiff was able to work for a number of years during this period and managed to complete three years of school (T. at 25). Accordingly, the ALJ found the plaintiff disabled only as of November, 1985, and denied his claim for disability benefits.

### IV. DISCUSSION

■ The initial question in this case is whether the ALJ correctly applied the treating physician rule to the evidence given by Dr. Szymanski. Where the treating physician rule has been applied incorrectly, a decision by the Secretary denying benefits cannot be upheld on the grounds that the denial is supported by substantial evidence. *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987).

The Secretary argues that the ALJ correctly refused to apply the treating physician rule to Dr. Szymanski's opinion for the period prior to the beginning of the plaintiff's treatment. However, it is the rule in this circuit that the correct application of the treating physician's rule depends on the nature of the physician's relationship with the claimant, rather than on its duration or coincidence with a claim for benefits. *Schisler v. Bowen,* 851 F.2d 43, 45 (2d Cir.1988). Once the treating physician relationship is established, the physician's opin-

ion is "entitled to significant weight. '[A] diagnosis of a claimant's condition may properly be made even several years after the onset of the impairment.'" *Dousewicz v. Harris*, 646 F.2d 771, 774 (2d Cir.1981) (accepting a treating physician's opinion that disability began five years prior to first treatment), *citing Stark v. Weinberger*, 497 F.2d 1092, 1097 (7th Cir.1974). A retroactive diagnosis must be "predicated upon a 'medically accepted clinical diagnostic technique'" and it must establish "existence of a 'physical impairment' prior to "the expiration of insured status." *Id.*

The Secretary incorrectly relies on *Arnone v. Bowen*, 882 F.2d 34 (2d Cir.1989), for the proposition that the treating physician rule should not be applied to retroactive diagnoses. In *Arnone* the court refused to accept a physician's opinion given in 1987 that claimant's disability had continued since 1973. The physician had treated the claimant during the earlier period from 1973 to 1974. However, he had not maintained a relationship with the claimant through the intervening years. Claimant consulted the doctor in 1987 only "at the suggestion of Arnone's counsel." *Id.* at 40. As a result the court found no "ongoing physician-treatment relationship" upon which to base application of the treating physician's rule. Additionally, the physician's opinion in *Arnone* was contradicted by testimony from four other medical sources. The court refused to accept its validity.

*Arnone*, however, did accept the general principle that a disability can be established without contemporaneous evidence. The court stated that "[d]epending on the nature of the disability," post-status evidence

could be used to establish a prior period of disability. *Id.* at 39.[1]

In this case Dr. Szymanski had been treating the plaintiff for 18 months prior to his first submitting evidence. He had a longstanding physician-patient relationship with the plaintiff. There was no other person in as good of a position to evaluate plaintiff's disability. Under these circumstances, his opinion as to date of onset should have been given the weight required by the treating physician's rule. The ALJ incorrectly dismissed his opinion as "speculative" for the period prior to the beginning of treatment.

Once it is established that the treating physician's rule was applied incorrectly, the Secretary's denial of benefits may not be upheld based on the substantial evidence standard. The case may be remanded to the Secretary for correct application of the rule, or where proof of disability is sufficiently persuasive, judgment may be entered for the claimant. *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir.1987); *Hamm v. Secretary*, 704 F.Supp. 357, 362 (W.D.N.Y. 1989).

■ Under a correct application of the treating physician's rule, the "treating physician's opinion on the subject of medical disability, i.e. diagnosis and nature and degree of impairment, is: (i) binding on the fact-finder unless contradicted by substantial evidence; and (ii) entitled to some extra weight because the treating physician is usually more familiar with a claimant's condition than are other physicians...." *Schisler v. Heckler*, 787 F.2d 76, 81 (2d Cir.1986) *aff'd. in relevant part*, 851 F.2d 43 (2d Cir.1988). "Substantial evidence is such relevant evidence as a reasonable mind would accept as adequate to support

---

1. It is unclear exactly what the court meant by "depending on the nature of the disability." In a citation, the court compared *Guzman v. Bowen*, 801 F.2d 273, 274–75 (7th Cir.1986), with *Dominick v. Bowen*, 861 F.2d 1330, 1333 (5th Cir.1988). *Guzman* accepted an IQ test administered after expiration of insured status as evidence of the claimant's condition during the insured period. *Dominick* disregarded evidence of post-insured status mental disorders. Other courts have disagreed about whether to allow post-insured evidence of mental disorders.

*Compare Kay v. Secretary*, 683 F.Supp. 136, 139 (D.S.C.1988) (court refused to accept retroactive diagnosis of post traumatic stress disorder by non-treating psychologists) *with Stevens v. Secretary*, 689 F.Supp. 517 (W.D.Pa.1988) (accepting retroactive opinion of mental health professional as to date of onset of disability). *See also Wooldridge v. Bowen*, 816 F.2d 157 (4th Cir. 1987) (accepting physician's report based largely on claimant's medical history as evidence of claimant's prior breathing difficulties).

a conclusion." *Schisler v. Bowen*, 851 F.2d 43, 47 (2d Cir.1988). Reports of non-treating, non-examining, or once-examining physicians may not constitute substantial evidence. *Sullivan v. Secretary*, 666 F.Supp. 456, 459 (W.D.N.Y.1987); *but see Schisler*, 851 F.2d at 46 (approving a draft Social Security Ruling which allows reports of non-examining medical personnel to override opinion of treating physician).

■ In this case, there is very little evidence which contradicts the opinion of the treating physician, Dr. Szymanski, that plaintiff has been disabled since November, 1980, due to his PTSD. The ALJ pointed to the fact that plaintiff attended college for three years and held and was able to work for a number of years. He also found that plaintiff's PTSD increased in severity as time went on. As a result, he concluded that the PTSD only reached disabling proportions in 1985 (T. at 25–26).

These assertions do not constitute substantial evidence contradicting Dr. Szymanski's opinion. Though indicating that plaintiff's PTSD had been present since Vietnam, Dr. Szymanski, in his September 12, 1988, letter, specifically stated that plaintiff "has been totally disabled since November of 1980." (T. at 324.) This opinion is not contradicted by evidence of the plaintiff's activities prior to 1980. There is more than enough evidence in the record to suggest that plaintiff's PTSD began in 1968 and thereafter progressed to the point of total disability in 1980 when his back pain became worse. Plaintiff's experiences with the police, the violent incident at Erie Community College, his psychiatric hospitalizations in 1972 and 1975, his recurring recollections of Vietnam while working as an electrician, and his difficulty dealing with other people all support Dr. Szymanski's diagnosis.

■ Several other indications in the record might serve to contradict Dr. Szymanski's opinion. Plaintiff was examined at the VAMC Hypertension Clinic in April, 1980. Dr. Herman, the director of the clinic, noted plaintiff's history of personality disorder and found him "asymptomatic at present time." (T. at 237–38.) This brief description, however, is not enough to constitute substantial evidence. No psychiatric examination was conducted at the Hypertension Clinic, and no psychiatric history was taken relating to his experiences in Vietnam.

In May, 1981, plaintiff was described as competent and employable in a VAMC termination summary. Again, this description is suspect. Barbara Wolfrum, the social worker who signed the report with a doctor, described the employability determination as a mistake. She stated in a letter dated September 21, 1988, that the summary was later corrected to read that no determination of employability was made at that time. In her professional judgment, the plaintiff "could not have held a job at that time.... I definitely would not have recommended him to any employer." (T. at 345–347, 424.)

In July of 1981, plaintiff was offered surgery on his L5–S1 herniated disc. Initially, he declined surgery and was discharged from VAMC on July 2, 1981, as "employable." (T. at 426–427.) Again, however, there is no indication of a psychiatric examination of any kind on the discharge summary. Plaintiff was at VAMC for treatment of a herniated disc, and the discharging physicians were neurologists, not psychiatrists.

There are other indications that plaintiff sought or was referred to vocational rehabilitation during 1982 and 1983 (T. at 228–29, 419). These unexplained references do not establish that plaintiff was employable or not disabled during this period. Nor do they constitute substantial evidence contradicting Dr. Szymanski's determination of disability.

In November, 1985, plaintiff was again hospitalized at VAMC. The discharge summary diagnoses his PTSD condition, but describes him as "competent and employable." The summary was prepared and signed by Dr. N.R. Kommareddi, a VAMC staff psychiatrist. His report directly contradicts Dr. Szymanski's determination of total disability. Due to the plaintiff's lengthy hospital stay prior to preparation of the report which directly addresses

plaintiff's PTSD, Dr. Kommareddi's discharge summary does constitute substantial medical evidence contradicting the opinion of Dr. Szymanski.

However, under the treating physician's rule, Dr. Szymanski's opinion is still entitled to extra weight because of his continuing and longstanding relationship with the patient. Under this second prong of the test, it is clear that the Secretary cannot prevail. Dr. Szymanski began his physician-patient relationship with the plaintiff at the very time of Dr. Kommareddi's report. His care of the plaintiff continued for 18 months before his first May, 1987, assessment of plaintiff's disability. If Dr. Szymanski's opinion is given extra weight in the analysis, his opinion based on a longstanding relationship with the plaintiff outweighs a contemporaneous opinion by hospital staff without such a relationship. Additionally, Dr. Szymanski's opinion is buttressed by the opinions of Sharon McGrath, director of C.O.P.I.N. House, and Barbara Wolfrum, a social worker. Consideration of the evidence leads to the conclusion that the Secretary's denial of disability benefits is not supported by substantial evidence.

Of secondary significance and in part used by the court in rendering its decision is Social Security Regulation 83–20. Social Security Reporting Service, Rulings: Supplementary Pamphlet 1989 (West's 1983). This concerns methods for establishing the onset of disability under Titles II and XVI. In this regard, medical evidence serves as the primary element in determining the onset of disability. However, according to this regulation, inference as to the onset date of a disabling impairment can be determined by the medical evidence. In this case, it appears that Dr. Szymanski, the treating physician, did just that. He took into account various sources of documentation to furnish additional evidence regarding the course of claimant's condition. He then concluded, as SSR 83–20 indicates he might, that on the bases of inference and medical evidence, claimant had been totally disabled since November of 1980.

## V. CONCLUSION

The ALJ incorrectly applied the treating physician's rule to the facts of this case. Under a correct application of the rule, the ALJ's decision is not supported by substantial evidence. Because the evidence of plaintiff's disability is persuasive, there is no need for remand in this case. Plaintiff's motion for summary judgment is granted. This case is remanded to the Secretary for the calculation of benefits.

So ordered.